# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNROW HUMAN RIGHTS IMPACT LITIGATION CLINIC, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 13-cv-1573 (KBJ) |
| U.S. DEPARTMENT OF STATE, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff UNROW Human Rights Impact Litigation Clinic ("UNROW") is a "litigation program at American University Washington College of Law" that "provides pro bono legal representation to clients seeking redress for violations of their human rights." (Compl., ECF No. 2, ¶ 11.) Among UNROW's clients are the Chagossians, a group of displaced indigenous people from the Chagos Archipelago in the British Indian Ocean Territory. (*See id.* ¶ 3.) In 2013, UNROW filed several document requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking a particular diplomatic cable that the United Kingdom allegedly sent to the United States concerning the British Indian Ocean Territory; UNROW had become interested in the cable after an international news outlet published a purported copy of the document in 2010. (*See* Compl. ¶¶ 14–18.) In response to these requests, the State Department ("State") and the Defense Intelligence Agency ("DIA" and, collectively, "Defendants")

informed UNROW that Defendants had located one responsive document and that the document was being withheld in its entirety on national security and/or foreign relations grounds.  (*See id.* ¶ 28.)  UNROW filed the instant lawsuit on October 15, 2013, claiming wrongful withholding of agency records in violation of the FOIA, and seeking an injunction to compel production of the document.  (*See id.* at 8–9.)

Before this Court at present are the parties' cross-motions for summary judgment.  (*See* Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 27, 1–2; Pl.'s Cross-Mot. for Summ. J. & Opp'n to Defs.' Mot. ("Pl.'s Cross-Mot."), ECF No. 29, 1–2.)[1]  Defendants maintain that they have lawfully withheld the responsive document at issue on the basis of FOIA Exemption 1 because the document is a confidential foreign relations communication that was properly classified under Executive Order 13526. (*See* Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Br."), ECF No. 27, 11–30, at 20–28.) Meanwhile, UNROW argues that Defendants have waived the ability to invoke Exemption 1 with respect to the disputed document since, according to UNROW, the information contained in that document is already available in the public domain and has been officially acknowledged.  (*See* Pl.'s Mem. in Supp. of Pl.'s Cross-Mot. for Summ. J. & Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Br."), ECF No. 29, 3–45, at 26–36; *see also* Pl.'s Reply Mem. in Supp. of Pl.'s Mot. ("Pl.'s Reply"), ECF No. 42, at 8–11.)  UNROW also challenges DIA's decision to let State make a disclosure determination on behalf of both Defendants in response to UNROW's requests (*see* Pl.'s Br. at 39–45; Pl.'s Reply at 11–12), and further asks this Court to conduct an *in camera* review of the withheld document (*see* Pl.'s Br. at 36–37; Pl.'s Reply at 15–18).

---

[1] Citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

Upon consideration of the parties' submissions, the relevant authorities, and the record as a whole, this Court concludes that Defendants properly invoked Exemption 1 to withhold the document at issue; that there was nothing improper about how DIA handled the responsive document once the agency located it; and that there is no need for this Court to review the document *in camera*.  Consequently, Defendants' motion for summary judgment will be **GRANTED**, and Plaintiff's cross-motion for summary judgment will be **DENIED**.  A separate order consistent with this memorandum opinion will follow.

## I.    BACKGROUND

UNROW is a self-described advocate for the Chagossian people.   UNROW asserts that the Chagossians "were unlawfully expelled" from the Chagos Archipelago "in the late 1960s and early 1970s" and that their continued displacement is due to an "international effort to permanently prevent [their] return and [the] resettlement of" those islands.  (Compl. ¶ 3.)  As part of its advocacy, UNROW previously filed FOIA requests with DIA in 2001, and also with State in 2010, seeking "information concerning the Islands of the Chagos Archipelago" (Pl.'s Response to Def.'s Statement of Material Facts & Pl.'s Statement of Material Facts ("Pl.'s SOF"), ECF No. 37-1, ¶ II.1), and "documents concerning the possible resettlement of the Chagos Archipelago by the Chagossian people" (*id.* ¶ II.2), respectively.  In response to those requests, Defendants produced a total of forty-two documents, certain portions of which had been redacted.  (*See id.* ¶¶ II.1–2; *see also* Letter from Alesia Y. Williams, Chief, DIA FOIA Staff, to Michael E. Tigar, American University Washington College of Law (Dec. 22, 2009), Ex. G to Pl.'s SOF, ECF No. 37-2, at 2; Letter from Charlene Wright Thomas, Acting Co-Dir., State Dep't Office of Info. Programs & Servs. ("IPS"), to Ali Beydoun,

UNROW Human Rights Impact Litigation Clinic (Mar. 29, 2011), Ex. H to Pl.'s SOF,

ECF No. 37-3, at 2–3; Exs. I–T to Pl.'s Cross-Mot., ECF Nos. 29-11–29-22.)[2]

On December 2, 2010—while State was still processing one of UNROW's prior

document requests (*see* Pl.'s SOF ¶ II.2)—*The Guardian* published a document on its

website that appeared to be a leaked copy of a U.S. diplomatic cable dated May 15,

2009, with the subject line: "HMG FLOATS PROPOSAL FOR MARINE RESERVE

COVERING THE CHAGOS ARCHIPELAGO (BRITISH INDIAN OCEAN

TERRITORY)[.]"  (*US embassy cables: Foreign Office does not regret evicting Chagos*

*islanders*, The Guardian, Dec. 2, 2010, Ex. U to Pl.'s SOF, ECF No. 37-4, at 2; *see also*

Pl.'s SOF ¶ II.3.)[3]  Three years later, in April of 2013, UNROW submitted the five

FOIA requests at issue in the instant case—one to DIA and four to various offices at

State—attaching the document published in *The Guardian* and seeking

> access to and a copy of the cable from the Embassy of the
> United States in London bearing the Reference ID
> "09LONDON1156," sent on May 15, 2009, with the subject
> "HMG FLOATS PROPOSAL FOR MARINE RESERVE
> COVERING THE CHAGOS ARCHIPELAGO (BRITISH
> INDIAN OCEAN TERRITORY)."

(*See* Letter from UNROW, to Williams (Apr. 22,, 2013), Ex. A to Williams Decl., ECF

No. 27-15, at 1; Letter from UNROW, to IPS (Apr. 22, 2013), Ex. 1 to Hackett Decl.,

ECF No. 27-2, at 2; Letter from UNROW, to Zipora Bullard, FOIA Office, Dep't of State,

Office of Inspector Gen., Office of Gen. Counsel (Apr. 22, 2014), Ex. 2 to Hackett Decl.,

---

[2] The current record does not specify whether or not UNROW appealed, litigated, or otherwise
contested State and DIA's redactions with respect to these documents.

[3] According to *The Guardian*'s website, the published document was one of "250,000 cables leaked to
the Guardian by whistleblowers' website WikiLeaks[.]"  *US Embassy Cables: The Documents*, The
Guardian, http://www.theguardian.com/us-news/series/us-embassy-cables-the-documents (last visited
September 29, 2015).

ECF No. 27-3, at 1; Letter from UNROW, to Sheryl L. Walter, Director, IPS (Apr. 23, 2013), Ex. 3 to Hackett Decl., ECF No. 27-4, at 2; Letter from UNROW, to Bullard (Apr. 23, 2013), Ex. 4 to Hackett Decl., ECF No. 27-5, at 1.)

On April 24, 2013, DIA sent UNROW a letter acknowledging receipt of one of its FOIA requests and explaining that, because State would likely be "the originator" of such a document, State (and not DIA) would have "final release authority with respect to [the] request." (Defs.' Statement of Material Facts ("Defs.' SOF"), ECF No. 27, 3–10, ¶ 15; *see also* Pl.'s SOF ¶ I.15; Decl. of Alesia Y. Williams, DIA FOIA Services Section Chief ("Williams Decl."), ECF No. 27-14, ¶ 5; Letter from Williams to Beydoun (Apr. 24, 2013), Ex. B to Williams Decl., ECF No. 27-16, at 1.) DIA then "searched one of the Agency's primary databases, Web Intelligence Search Engine ('WISE') and located one document that was deemed to be responsive to [UNROW]'s request based upon the description in the original request letter." (Defs.' SOF ¶ 16 (citing Williams Decl. ¶ 6); *cf.* Pl.'s SOF ¶ I.16.) On May 6, 2013, DIA forwarded that document to State, along with UNROW's request, to facilitate State's "review and direct reply to [UNROW]." (Decl. of John F. Hackett, Acting Dir., IPS ("Hackett Decl."), ECF No. 27-1, ¶ 8; *see also* Letter from Williams, to IPS (Mar. 6, 2013), Ex. 6 to Hackett Decl., ECF No. 27-7, at 1.) On the same day, DIA sent a second letter to UNROW stating that DIA had "located one 7-page document that was potentially responsive to" UNROW's request and that DIA had referred "the potentially responsive document . . . [to] State for its review[.]" (Defs.' SOF ¶ 17 (citing Williams Decl. ¶ 7; Ex. D to Williams Decl., ECF No. 27-18, at 1).)[4]

---

[4] UNROW filed an administrative appeal of DIA's decision to refer the responsive document to State on June 11, 2013. (*See* Defs.' SOF ¶ 18; Pl.'s SOF ¶ I.18; *see also* Letter from Williams to Beydoun (Jul.

Meanwhile, State had acknowledged receipt of UNROW's four other FOIA requests on April 30, 2013. (*See* Defs.' SOF ¶ 5 (citing Letter from Mary Therese Castor, Chief, Requester Commc'ns Branch, IPS, to UNROW (Apr. 30, 2013), Ex. 5 to Hackett Decl., ECF No. 27-6 at 1–3); *see also* Pl.'s SOF ¶ I.5.)   After reviewing those requests, State "determined that the only records system reasonably likely to contain the record sought by [UNROW] was the Central Foreign Policy Records" database. (Defs.' SOF ¶ 11 (citing Hackett Decl. ¶ 17); *cf.* Pl.'s SOF ¶ I.11.)   State searched the Central Foreign Policy Records database using the "[m]essage [r]eference [n]umber" in UNROW's requests (Defs.' SOF ¶¶ 13–14) and, according to State, the search returned "a single responsive record" (*id.* ¶ 14). (*Cf.* Pl.'s SOF ¶¶ I.13–14.)   State also received from DIA a copy of UNROW's request to DIA and the document that DIA had identified as responsive. (*See* Defs.' SOF ¶ 17; *see also* Pl.'s SOF ¶ I.8.)

On July 5, 2013, State wrote a letter to UNROW in response to UNROW's FOIA requests stating that "[r]ecord searches by the Department of State and by the Defense Intelligence Agency each resulted in the retrieval of one identical document responsive to [UNROW's] requests[,]" and explaining that "[a]fter reviewing this document," State had "determined that it must be withheld in full" pursuant to FOIA Exemption 1 because "[t]he material [in the document] is currently and properly classified under Executive Order 13526 in the interest of national defense or foreign relations." (Letter

---

9, 2013), Ex. F to Williams Decl., ECF No. 27-20, at 1.)   DIA denied UNROW's appeal on August 20, 2013, informing UNROW "that DIA had no legal authority to make a release determination" with respect to the document in question. (Defs.' SOF ¶ 19 (citing Letter from Don Washington, Deputy Dir., DIA Office of Facilities & Servs., to Beydoun ("Washington Letter"), Ex. G to Williams Decl., ECF No. 27-21 at 1).)

from Walter, to Beydoun (Jul. 5, 2013), Ex. 10 to Hackett Decl., ECF No. 27-11, at 1; *see also* Defs.' SOF ¶¶ 20–21; *cf.* Pl.'s SOF ¶¶ I.20–21.)[5]

UNROW filed the instant action in federal court on October 15, 2013. (*See* Compl.) UNROW's complaint maintains that Defendants improperly withheld the document in question (*see id.* ¶¶ 5–6) and asks this Court to issue an injunction requiring Defendants to release the document (*see id.* ¶ 7). Defendants filed their motion for summary judgment on September 23, 2014 (*see* Defs.' Mot.), arguing that they are entitled to judgment as a matter of law because they "conducted reasonable and adequate searches for records responsive to [UNROW]'s FOIA requests" (*id.* at 19) and provided sufficiently detailed affidavits justifying their invocation of Exemption 1 to withhold the responsive document in its entirety (*see id.* at 19–29). UNROW filed its cross-motion for summary judgment and opposition to Defendants' motion on October 23, 2014. (*See* Pl.'s Cross-Mot.) UNROW insists that Defendants may not invoke Exemption 1 to withhold the document at issue because the document is available in the public domain and, according to UNROW, Defendants have officially acknowledged its contents. (*See* Pl.'s Br. at 28–36.) Moreover, UNROW argues that even if Exemption 1 was properly invoked, Defendants have failed to provide the requisite level of detail necessary to justify their withholding of the requested document in its entirety. (*See id.* at 14–22, 37–39.) Finally, UNROW contends that DIA's referral of the responsive

---

[5] UNROW filed an administrative appeal challenging State's withholding of the responsive document on July 15, 2013. (*See* Defs.' SOF ¶ 23 (citing Letter from UNROW, to Chairman, Dep't of State Appeals Review Panel (Jul. 15, 2013), Ex. 11 to Hackett Decl., ECF No. 27-12, at 1); *see also* Pl.'s SOF ¶ I.23.) State acknowledged receipt of UNROW's appeal on August 27, 2013, but before State could grant or deny the appeal, UNROW filed the instant lawsuit in federal court and State subsequently closed UNROW's appeal in light of this litigation. (*See* Defs.' SOF ¶ 24 (citing Letter from Lori Hartmann, Appeals Officer, IPS, to UNROW (Aug. 27, 2013), Ex. 12 to Hackett Decl., ECF No. 27-13, at 1; Hackett Decl. ¶ 14); *see also* Pl.'s SOF ¶ I.24 (citing Letter from Hartmann, to UNROW (Mar. 28, 2014), Ex. F to Pl.'s Br., ECF No. 29-8, at 2).)

document in its possession to State was improper (*see id.* at 39–45), and that this Court's *in camera* review of the document in question is necessary to resolve the parties' cross-motions for summary judgment (*see id.* at 36–37).

The parties' cross-motions for summary judgment are now fully briefed and ripe for this Court's review.

## II.   APPLICABLE LEGAL STANDARDS

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Sciacca v. FBI*, 23 F. Supp. 3d 17, 26 (D.D.C. 2014) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (internal quotation marks omitted)); *see Rushford v. Civiletti*, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980) (explaining that "the development of a factual record would, as a practical matter, be impossible" without revealing the very information that the government seeks to protect), *aff'd sub nom. Rushford v. Smith*, 656 F.2d 900 (D.C. Cir. 1981).  Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment when the pleadings, disclosure materials on file, and affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Sciacca*, 23 F. Supp. 3d at 26.

The FOIA "expressly places the burden on the agency to sustain its action," and the court must review the agency's action *de novo.  DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989) (internal quotations omitted); *see also* 5 U.S.C. § 552(a)(4)(B); *Military Audit Project v. Casey*, 656 F.3d 724, 738 (D.C. Cir. 1981).  In reviewing the agency action, the Court must analyze the facts and inferences in the light most favorable to the FOIA requester.  *See Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  Accordingly, summary judgment for the

agency is appropriate if the agency proves that it has "fully discharged its FOIA obligation[]" to conduct an adequate search for responsive information, *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983), and has provided sufficiently detailed explanations justifying nondisclosure, *see Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973).

In the FOIA context, a court may grant summary judgment solely on the basis of agency affidavits "if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project*, 656 F.3d at 738. Thus, "[u]ncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011). Agency affidavits "are accorded a presumption of good faith," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and "in national security cases . . . Congress has instructed the courts to accord 'substantial weight'" to such affidavits, *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (internal quotation marks and citation omitted). Indeed, the D.C. Circuit has adopted a "deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security[,]" *Larson v. Dep't of State*, 565 F.3d 857, 865 (2009); accordingly, the government's "arguments needs only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011).

### III.   ANALYSIS

The FOIA mandates broad disclosure of government records to the public, *CIA v. Sims*, 471 U.S. 159, 166 (1985), subject to nine enumerated exemptions, *see* 5 U.S.C. § 552(b).  For the reasons explained below, this Court concludes (a) that Defendants properly invoked Exemption 1 and did not waive their right to invoke that Exemption via public disclosure, (b) that DIA did not err by referring the document to State, and (c) that *in camera* review is unnecessary.  Consequently, the Court will grant Defendants' cross-motion for summary judgment and will order that judgment be entered in Defendants' favor.

### A.   Defendants Properly Invoked FOIA Exemption 1 To Withhold The Document At Issue Because The Document Is Properly Classified Pursuant To Executive Order 13526

Exemption 1 excludes from disclosure "matters that are . . . (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]"  *Id.* § 552(b)(1).   State invokes Exemption 1 in the context of the instant case on the basis of Executive Order 13526.  (*See* Defs.' Br. at 21.)  Information may be classified under that Order if it meets the following conditions:

    (1) [A]n original classification authority is classifying the information;

    (2) the information is owned by, produced by or for, or is under the control of the United States Government;

    (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

    (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against

10

> transnational terrorism, and the original classification authority is able
> to identify or describe the damage.

Exec. Order. No. 13,526, § 1.1(a).  This Court finds that the document at issue here satisfies each of these criteria.

First of all, both State and DIA establish, by way of respective declarations, that State is the proper classification authority for the document.  (*See* Hackett Decl., ¶¶ 23–24, 31; Williams Decl. ¶ 9.)   UNROW does not refute these statements or present evidence to the contrary, and in any event, courts must "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Ray v. Turner*, 587 F.2d 1187, 1193 (D.C. Cir. 1978); *see also Fitzgibbon v. CIA*, 911 F.2d 755, 762 (D.C. Cir. 1990).

Second, Hackett's declaration asserts that the withheld document is a "[State] Department telegram (also known as a 'cable')" and that "[t]he information contained in [the] cable is owned by and under the control of the U.S. Government."  (Hackett Decl. ¶ 23; *see also* Williams Decl. ¶ 9.)  UNROW does not dispute these statements—indeed, a diplomatic cable between the United States and a foreign government is exactly what UNROW seeks from Defendants' possession.  (*See* Compl. ¶¶ 3–4.)

Third, Defendants establish that the document in question meets the requirements of Section 1.4 of executive order.  This section "details seven categories of information that may be considered for classification," *Darui v. U.S. Dep't of State*, 798 F. Supp. 2d 32, 40 (D.D.C. 2011), and the document in this case falls into two of those categories.  First, Section 1.4(b) permits information to be classified if it "pertains to . . . foreign government information[,]" Exec.

Order No. 13,526, § 1.4(b), which is defined as "information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence," *id.* § 6.1(s).  Hackett stated in his affidavit that "[t]he document contains a report of a conversation with senior officials of the British Government regarding that government's plans . . . cover[ing] a variety of sensitive political and strategic considerations," and that "the entirety of the cable contains information provided to the United States with the clear expectation of confidentiality."  (Hackett Decl. ¶ 32.)  UNROW not only presents no evidence to the contrary, but its own allegations about the nature of the document are in accord with the description that Defendants provide.  (*See* Compl. ¶¶ 3–4; Pl.'s Br. at 15–17.)  Furthermore, information may also be classified pursuant to Section 1.4 of the executive order if it pertains to "foreign relations or foreign activities of the United States, including confidential sources."  Exec. Order 13.526, § 1.4(d).  Hackett declared that the document at issue "concerns sensitive aspects of U.S. foreign relations, including, in particular, issues relating to the plans and intentions of a foreign government."  (Hackett Decl. ¶ 30.)  Again, UNROW does not contest this description.  Thus, the withheld document satisfies Section 1.1(a) of E.O. 13526 because it falls within the categories listed in Sections 1.4(b) and 1.4(d).  *See Darui*, 798 F. Supp. 2d at 40–41 (finding that requested documents met the same criteria on the basis of similar averments in an affidavit from a State Department official).

UNROW's challenge focuses on Section 1.1(a)'s fourth and final requirement: the classifying authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and "[be] able to identify or describe the damage."   Exec. Order 13,526, § 1.4(d).   For purposes of Executive Order 13256, "damage to the national security" means "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information."   *Id.* § 6.1(e)(l).   Courts in this circuit "have consistently deferred to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review" of such claims, *ACLU*, 628 F.3d at 624 (internal quotation marks and citation omitted), because "judges . . . lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case," *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980).

Hackett explained in his sworn declaration that "[t]he ability to obtain information from foreign governments is essential to the formulation and successful implementation of U.S. foreign policy," and that the "[r]elease of foreign government information provided in confidence to the U.S. Government," such as the document at issue, "would cause . . . [f]oreign governments . . . to be less willing in the future to furnish information important to the conduct of U.S. foreign relations, and . . . less disposed to cooperate with the United States in the achievement of foreign policy objectives[.]"   (Hackett Decl. ¶ 28.)   Thus, Hackett

declared that the document's disclosure would not only "damag[e] our relations with the British Government" (*id.* ¶ 32), but would also impair "future access not only to the sources of the [document in this case], but also to others who might provide sensitive information to U.S. officials that is important to U.S. foreign policy interests" (*id.* ¶ 30).

This Court finds that Defendants' affidavits are sufficient to satisfy the requirements of Section 1.1(a)(4).   Defendants do more than "merely recite statutory standards," *Larson*, 565 F.3d at 864; they specifically identify the origin of the information and articulate the damage its disclosure would do to relations with the United Kingdom and the chilling effect it would have on U.S. relations with other countries and other sources of sensitive information.   This argument is perfectly plausible; indeed, courts in this circuit have long recognized the legitimacy of this species of national security harm in the FOIA context.   *See, e.g.*, *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993) (upholding the withholding of a document under Exemption 1 where "[r]elease of the document would, in the Department's judgment, jeopardize 'reciprocal confidentiality' and damage national security"); *Darui*, 798 F. Supp. 2d at 41 (finding that a document satisfied Section 1.1(a)(4) of Executive Order 13526 where a State Department official's affidavit stated that its disclosure would undermine foreign confidence in the confidentiality of diplomatic exchanges with the U.S., thereby "chill[ing] relations with other countries" and "diminishing . . . access to vital sources of information"); *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 306 F. Supp. 2d 58, 66 (D.D.C. 2004) (upholding the withholding of telegrams between a U.S.

Embassy and the State Department under Exemption 1 where disclosure "could adversely affect the persons involved, inhibit the willingness of . . . foreign government officials to discuss frankly with U.S. government officials matters affecting our national interests, and damage relations with the Dominican Republic").   Moreover, the disclosure of a document containing foreign government information "is presumed to cause damage to national security." Exec. Order No. 13,526, § 1.1(d); *see Darui*, 798 F. Supp. 2d at 41.

UNROW argues that Defendant's description of the information itself and the potential harm to national security is insufficiently specific.  (Pl.'s Br. at 17–20.)  But any greater specificity would "force [State] to breach its promises of confidentiality," *Krikorian*, 984 F.2d at 464, thereby incurring the very damage the government seeks to avoid.  What is more, "any affidavit or statement of threatened harm will always be speculative to some extent in the sense that it describes a potential future harm," and therefore, the only question for the court is "whether the predicted danger is a reasonable expectation." *Halperin*, 629 F.2d at 149.  This Court finds that Defendants' detailed affidavits set forth reasons for invoking Exemption 1 that are both plausible and logical, *see ACLU*, 628 F.3d at 624, and given the substantial deference owed to government affidavits in this context, the Court concludes that Defendants have carried their burden.

### B. Plaintiff Has Failed To Establish That Defendants Waived The Right To Invoke Exemption 1

"[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Fitzgibbon*, 911 F.2d at 765.  The logic behind this exception to the invocation of FOIA Exemption 1 is

that, in some circumstances, the release of information that is already publicly known

"cannot be expected to cause damage to national security or disclose intelligence

sources[.]" *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). But courts

have recognized the limits of this argument, because even if a piece of information "is

the subject of widespread media and public speculation, its official acknowledgement

by an authoritative source might well be new information that could cause damage to

the national security." *Id.* Consequently, the D.C. Circuit has established three criteria

that must be satisfied in order for a plaintiff to be able to rely on the official

acknowledgement exception:

> First, the information requested must be as specific as the
> information previously released. Second, the information requested
> must match the information previously disclosed . . . . Third, . . . the
> information requested must already have been made public through
> an official and documented disclosure.

*Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon*, 911 F.2d at 765)

(alterations in original).

Although the government bears the burden of proving that its withholding of

information is justified under one of the FOIA exemptions, "a plaintiff asserting a claim

of prior disclosure must bear the initial burden of pointing to specific information in the

public domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130;

*accord Wolf*, 473 F.3d at 378. The first two criteria "insist[] on exactitude": "[p]rior

disclosure of *similar* information does not suffice; instead, the specific information

sought by plaintiff must already be in the public domain by official disclosure." *Wolf*,

473 F.3d at 378 (emphasis added). To be sure, this is a "high hurdle for a FOIA

plaintiff to clear, but the Government's vital interest in information relating to national

security and foreign affairs dictates that it must be." *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993); *see also Stephens v. Dep't of Justice*, 26 F. Supp. 3d 59, 71 (D.D.C. 2014) ("[T]o defeat summary judgment, [the] plaintiff must cite to particular parts of the record to show that the requested information is identical to that in the public domain.").  As to the third criteria, "public disclosure alone is insufficient," because "the information must also be officially acknowledged." *ACLU v. Dep't of State*, 878 F. Supp. 2d 215, 223 (D.D.C. 2012) (internal quotations marks and citation omitted).  This is because "there can be a critical difference between unofficial and official disclosures," *Fitzgibbon*, 911 F.2d at 765—"the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause [cognizable] harm," *ACLU*, 878 F. Supp. 2d at 223 (quoting *Wolf*, 473 F.3d at 378) (internal quotation marks omitted).

Plaintiff has not carried its burden with regard to any of the three criteria.

1. <u>There Is No Reasonable Argument That State's July 5th Letter To UNROW Was An Official Acknowledgment Of The Document That Exists In The Public Domain</u>

UNROW contends that State's letter of July 5, 2013, constituted an official acknowledgement that *The Guardian* has already published the entirety of the requested document.  (Pl.'s Br. at 30–32.)  As mentioned, the letter stated: "Record searches by the Department of State and by the Defense Intelligence Agency each resulted in the retrieval of one identical document responsive to your requests."  (Ex. 10 to Hackett Decl. ("State's July 5 Letter"), ECF No. 27-11.)  And UNROW claims that this sentence is an admission that the responsive document was "identical" to the copy of the cable that UNROW had attached to its FOIA request.  (*See* Pl.'s Br. at 35–37.)

UNROW's interpretation is flatly contradicted by Hackett's affidavit, State Department policy, and common sense.  According to Hackett's sworn testimony, this statement was included in State's letter "to inform Plaintiff that the documents located separately by the [State] Department and DIA were identical *to each other*," and that "[State] did not make any statement to the effect that the document identified separately by [State] and DIA . . . is identical to a purported [State] cable allegedly published online by the *Guardian*."  (Hackett Decl. ¶ 12 (emphasis in original).  Hackett went on to explain that "[i]t is [State]'s policy to neither confirm nor deny the authenticity of purported [State] documents that have allegedly been disclosed to the public in an unauthorized manner."  (*Id.* ¶ 12 n.2.)  And Williams, too, testified that, in its correspondence with UNROW, DIA expressly "maintained that the correspondence itself was not an acknowledgment that the responsive record precisely matched the information plaintiff retrieved from a public website."  (Williams Decl. ¶ 9 (citing Washington Letter at 1).)

Defendants' proposed interpretation of the statement made in the July 5th letter gives the sentence its common sense meaning.  The plain and unambiguous role of the adjective "identical" in the sentence is to make clear that State and DIA each turned up *the same* document; without that crucial modifier, the sentence would suggest that the Departments turned up two different documents, each of which was responsive to UNROW's requests.  Surely, if State had intended to convey that the responsive document was identical to UNROW's attached copy of *The Guardian* document, it could have done so more clearly.  Moreover, it further undermines UNROW's stretched interpretation to realize that it would make no sense for State to withhold the

information due to national security concerns while simultaneously admitting the authenticity of *The Guardian* document.  Thus, this Court does not accept UNROW's insistence that the July 5th letter constituted an official acknowledgment.

2.   UNROW Has Not Proven That Information In Previously Released Cables Matches Exactly The Information In The Withheld Document

Furthermore, to the extent that UNROW maintains that it has met its burden because Defendants had officially acknowledged "much of the information" through their previous disclosure of certain cables (Pl.'s Br. at 32; *see id.* at 32–36), UNROW misunderstands the governing law.  In 2001 and 2010, UNROW submitted FOIA requests for "information concerning the Islands of the Chagos Archipelago" and "for copies of documents concerning the possible resettlement of the Chagos Archipelago by the Chagossian people," respectively, which resulted in the release of 36 documents from State.  (*Id.* at 32–33.)  UNROW claims that these documents "contain substantially similar factual information as the information withheld" (*id.* at 33), and, therefore, that Defendants have officially acknowledged the information UNROW now seeks and have waived the right to claim a FOIA exemption (*id.* at 35).  But it is clear beyond cavil that, for the purpose of demonstrating waiver, "[p]rior disclosure of *similar* information does not suffice."  *Wolf*, 463 F.3d at 378 (emphasis added).  Plaintiffs must show the "the *specific* information sought . . . [is] already . . . in the public domain by official disclosure," *id.*, and UNROW has not done so—it has not pointed to a single iota of information in the responsive document that Defendants have publically and officially acknowledged via its prior disclosures.  Indeed, all of the public information to which UNROW points is either only generally related to the responsive document (*see* Pl.'s Reply. at 8–9) or, while potentially similar, *predates* the requested document by at least

three years (*see* Pl.'s Br. at 39–43; Exs. I–T to Pl.'s Mot., ECF Nos. 29-11–22), when

the D.C. Circuit has made clear that a prior disclosure cannot operate as a waiver of

protection for information relating to a time period later than the date of the publicly

documented information.  *See Fitzgibbon*, 911 F.2d at 766; *Ashfar*, 702 F.2d at 1133.

In the final analysis, then, UNROW finds itself in an unfortunate Catch-22:

everything it asserts about the content of the withheld document is based on *The*

*Guardian* document (*see* Pl.'s Br. at 33, 34), but *The Guardian* document has never

been officially acknowledged and thus cannot form the basis of a valid waiver claim.

*See ACLU*, 878 F. Supp. 2d at 224 ("No matter how extensive, the WikiLeaks disclosure

is no substitute for an official acknowledgement and the [plaintiff] has not shown that

the Executive has officially acknowledged that the specific information at issue was a

part of the WikiLeaks disclosure.").  Thus, and also because a plaintiff cannot satisfy its

burden of demonstrating waiver by pointing to general, similar, or categorical

information under this Circuit's clear precedent, *see Wolf*, 473 F.3d at 378; *Afshar*, 702

F.2d at 1130–31, this Court concludes that Plaintiff has failed to establish that

Defendants waived the right to invoke Exemption 1.

C.     **There Is No Factual Or Legal Basis For This Court To Review The**
       **Document At Issue *In Camera* Or To Require DIA To Make An**
       **Independent Disclosure Determination**

UNROW requests that this Court conduct an *in camera* review of the withheld

document both to determine whether it contains officially acknowledged information

that was properly withheld and to determine whether Defendants failed to conduct a

segregability analysis.  (*See* Pl.'s Br. at 36–37.)  In the exercise of its "broad

discretion," *Center for Auto Safety v. EPA*, 731 F.2d 16, 20 (D.C. Cir. 1984), this Court

declines the invitation.

1.    <u>It Is Unnecessary And Inappropriate For The Court To Conduct An</u>
      <u>*In Camera* Review Of The Withheld Document</u>

Stated simply, Defendants have established that the responsive document logically and plausibly falls within Exemption 1 (*see* Section III.A, *supra*), and it would not be proper for this Court to conduct further review in order to second guess Defendants' determinations.  Although the FOIA certainly permits the Court to review withheld documents at the discretion of the court, 5 U.S.C. § 552(a)(4)(B), it is "neither necessary [n]or appropriate" to conduct such a review in situations where "the agency meets its burden by means of affidavit[,]" *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir. 1979).  "If the agency's affidavits 'provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.'"  *Larson*, 565 F.3d at 870 (quoting *Hayden*, 608 F.2d at 1387).  Put another way, if the government's affidavits themselves demonstrate that the document at issue qualifies for a FOIA Exemption, then this Court should not proceed further.  *See ACLU*, 628 F.3d at 625; *Halperin*, 629 F.2d at 148.  As already explained, such is the case here.

UNROW's arguments to the contrary are entirely unpersuasive.  First, UNROW suggests that *in camera* review is necessary to determine whether the responsive document is identical to *The Guardian* document, on the theory that, if this is so, it confirms UNROW's interpretation of State's use of the word "identical" in the July 5th letter.  (*See* Pl.'s Br at 37.)  But this Court has already rejected UNROW's interpretation based on the plain language of the letter, supported by affidavit and by State Department policy.  (*See* Section III.B.1, *supra*.)  UNROW also appears to

confuse what is necessary with what is sufficient—while it is necessary that the withheld document and *The Guardian* document be identical for UNROW's interpretation of the July 5th letter to prevail, that fact alone would hardly be sufficient to establish the letter's meaning; that is, even if the documents *are* identical, State could nevertheless have intended to use the adjective to refer to the DIA and State documents in the manner Hackett indicated.  Thus, the proper inquiry is not whether or not the withheld document and *The Guardian* document are *actually* identical, but whether or not State intended to convey as much in its letter to UNROW.  *In camera* review cannot resolve *that* question, and this Court declines to conduct such a review for this purpose.

Next, UNROW insists that *in camera* review is required to ensure that State properly conducted its "segregability analysis"—*i.e.*, its determination that no portion of the responsive document can be segregated and disclosed.  It is true that, "[e]ven when an agency may properly withhold a responsive record under one of FOIA's enumerated exemptions, it nevertheless must disclose any non-exempt information that is 'reasonably segregable.'"  *ACLU*, 878 F. Supp. 2d at 224 (quoting 5 U.S.C. § 552(b)).  To satisfy this obligation, "the agency 'must provide a reasonably detailed justification rather than conclusory statements to support its claim that the non-exempt material in a document is not reasonably segregable.'"  *Id.* (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)).  While agencies are "entitled to a presumption that they complied with the obligation to disclose reasonable segregable material[,]" *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citing *Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 391

(D.C. Cir. 2007)),  a FOIA requester can overcome that presumption with its own evidence, although "the quantum of evidence" required to do so is "not clear[,]"  *id.*

In this case, State asserts (by way of Hackett's affidavit) that "[t]here is no meaningful, non-exempt material that may be segregated, declassified, and released, because the entirety of the cable contains information provided to the United States with the clear expectation of confidentiality."  (Hackett Decl. ¶ 32.)  The affidavit clearly states that, because the document at issue "contains a report of a conversation with senior officials in the British Government . . . cover[ing] a wide variety of sensitive political and strategic considerations[,]" the "[r]elease of any portion of this material would amount to a serious breach of confidentiality, thereby damaging [U.S.] relations with the British Government and inhibiting [the U.S.'s] ability to engage in candid exchanges in the future."  (*Id.*)

UNROW presumably would like this Court to compare the withheld document to the previously released cables that UNROW has attached to its cross-motion for summary judgment (see Exs. I–T to Pl.'s Mot., ECF Nos. 29-11–22), as well as any other officially acknowledged information in the public domain (*see, e.g.*, Pl.'s Reply at 8–9), to determine whether any portion of the document falls outside of State's expressed confidentiality concern such that it may be released.  But the agency has explained that the *entire* document contains sensitive content, such that even a partial disclosure would break a promise of confidentiality and chill relations with a foreign government, and UNROW has not provided any evidence to rebut the presumption that the agency has complied with its obligations or to show that *in camera* review is warranted, even under the pro-disclosure standard articulated by the Supreme Court in

*National Archives and Records Administration v. Favish*, 541 U.S. 157 (2004).  *See id.* at 174 (holding that a plaintiff can overcome the government's presumption of legitimacy by "produc[ing] evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred"); *see also Sussman*, 494 F.3d at 1117 (finding that a challenge to an agency's segregability analysis failed where the plaintiff could not meet "[e]ven . . . the less demanding *Favish* standard").

UNROW presents no evidence that Defendants' segregability analysis was inaccurate or improper, and "it is not the Court's role to search through a party's exhibits . . . with the hope of finding the alleged matching pieces." *Stephens*, 26 F. Supp. 3d at 71.  Accordingly, this Court concludes that *in camera* review would be inappropriate.

2.   DIA Properly Forwarded The Document In Its Possession To State

Finally, this Court also rejects UNROW's separate contention that DIA acted improperly when it forwarded its own responsive document to State rather than releasing it.  There is no question that "[i]f an agency receives a FOIA request for documents within its possession, the agency is responsible for processing the request and 'cannot simply refuse to act on the ground that the documents originated elsewhere.'"  *Keys v. Dep't of Homeland Sec.*, 570 F. Supp. 2d 59, 66 (D.D.C. 2008) (quoting *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983)).  However, it is equally clear that the law permits an agency to "adopt procedures by which documents in the agency's possession, but which did not originate with the agency, may be referred to the originating agency for processing." *Id.*; *see McGehee,* 697 F.2d at 1110.  The D.C. Circuit has not adopted a "bright line" rule for when referral of responsive records to another agency constitutes an improper withholding; rather, it has stated that "[t]he

24

legal status of [referral] procedures [is] best determined on the basis of their

consequences." *McGehee*, 697 F.2d at 1110–11.  Thus, a referral is an improper

withholding of documents "if its net effect is significantly to impair the requester's

ability to obtain the records or significantly to increase the amount of time [the

requestor] must wait to obtain them[.]" *Id.*  And such a procedure is deemed improper

when the agency cannot "offer a reasonable explanation for its procedure." *Id.* at 1110;

*see also id.* (noting that it would be "highly difficult to justify" "a procedure that, in

practice, imposed very large burdens on requestors (*e.g.*, by compelling [requestors] to

pay huge processing costs or to submit separate requests to a number of independent

bodies) or that resulted in very long delays").

    To assist courts in evaluating the legality of an agency's referral procedures, the

D.C. Circuit in *McGehee* suggested a non-binding sample procedure, *see McGehee*, 697

F.2d at 1111, that focuses on the consequences of an agency referral procedure, and in

particular (1) "whether the originating agency demonstrated an intent to control the

records at issue[;]" (2) "whether the referral was 'prompt and public'[;]" and (3)

considering "the burden that the referral procedure places on the requestor, including

whether he would be required to file a separate FOIA request to the originating

agency." *Keys*, 570 F. Supp. 2d at 67 (citing *McGehee*, 670 F.2d at 1111).  In the

instant case, DIA processed Plaintiff's FOIA request, determined that the responsive

document originated with State, referred the document to State for its disclosure

determination, and communicated each of these facts to UNROW. (*See* Williams Decl.

¶ 7; Ex. D to Williams Decl., ECF No. 27-18, at 1.)  UNROW asserts that because DIA

possessed a responsive document, DIA itself was obligated to make an independent

disclosure determination, and that referring the document to State does not absolve DIA of this responsibility.  (*See* Pl.'s Cross-Mot. at 44–45.)  And while UNROW concedes that "under typical circumstances," the procedures DIA followed in this case would be sufficient (*see* Pl.'s Reply at 12), it nevertheless insists that DIA must make an independent disclosure determination because DIA's "correspondence and declaration contradict those of [State], creating significant confusion surrounding the record that . . . DIA retrieved," (*id.*).

The confusion that UNROW points to is one of its own invention.  UNROW maintains that State's response and DIA's response are in tension because State indicated that its document was "identical" to *The Guardian* document, while DIA expressly refused to acknowledge whether its record "matches the information [Plaintiff] received from a public website," and called its document only "potentially responsive."  (*See id.*)  Once again, Plaintiff's argument rests on an unreasonable interpretation of the word "identical" in State's July 5th letter.  Without that misreading, there is no confusion surrounding the DIA record nor is there any ambiguity about the possible existence of another responsive document.  In other words, the record is unambiguous that DIA possessed a copy of a seemingly responsive document that originated with State, and DIA believed State to be the proper authority to make the determination about responsiveness and disclosure.  (*See* Williams Decl. ¶ 9; (Defs.' Reply in Supp. of Mot. for Summ. J. and Opp'n To Pl.'s Cross Mot. for Summ. J., ("Defs.' Reply"), ECF No. 35, at 14.)

Furthermore, UNROW provides no legal authority establishing that DIA failed to fulfill its statutory obligations.  DIA did not "simply refuse to act," *Keys*, 570 F. Supp.

2d at 66; quite to the contrary, it conducted a record search pursuant to UNROW's search parameters (*see* Williams Decl. ¶ 6), identified a responsive document (*see id.* ¶¶ 6–7), and referred the responsive document to State after it determined that State, not DIA, had the legal authority to make the disclosure determination (*see id.* ¶¶ 5, 7; Ex. B to Williams Decl., ECF No. 27-16, at 1; Ex. D to Williams Decl., ECF No. 27-18, at 1). Moreover, DIA fully satisfied the non-binding *McGehee* sample procedure when it promptly informed UNROW in a public letter that the responsive document originated with State and that State retained authority over the document, and then promptly referred the document to State for disclosure determination. *See id.* at 1111–12. (Defs.' Mot. ¶¶ 17, 20.)  UNROW also failed to establish that DIA's procedure referring the responsive record to State burdened its exercise of rights under the FOIA in any way—indeed, at the time DIA referred the responsive document to State, UNROW had already submitted independent and identical FOIA requests to State (*see* Defs.' Mot. ¶¶ 1–4; Ex.B to Williams Decl.)—and there is no factual basis for any assertion that DIA's communication to UNROW and referral to State resulted in undue delay of the disclosure determination for DIA's responsive document.  (*See* Defs.' Mot. ¶¶ 1–4.)  Thus, this Court rejects UNROW's contention that DIA acted inappropriately when it referred to State the responsive document discovered pursuant to UNROW's FOIA request. *See Keys*, 570 F. Supp. 2d at 66.

## IV.   CONCLUSION

It is clear on the instant record that Defendants have "fully discharged [their] FOIA obligations[.]" *Weisberg*, 705 F.2d at 1350.  In light of their affidavits, and the substantial weight they are owed, it is both logical and plausible that the withheld document is properly classified under Executive Order 13526 and would fall under

FOIA Exemption 1.  UNROW's other arguments are unavailing for the reasons explained above, and it has failed to demonstrate the existence of any dispute of material fact.  Therefore, as set forth in the accompanying order, Defendants' motion for summary judgment will be **GRANTED**, and Plaintiff's cross-motion for summary judgment must be **DENIED**.


DATE:  September 29, 2015 *Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge